VARNER v. RICE.

1. PLEADING: *Answer of guardian ad litem.*

It is not sufficient for the answer of a guardian *ad litem* to deny generally, such of the allegations of the complaint as may be important to controvert, and submit the minor's interest to the protection of the court. The answer should be a full defense, specifically denying the material allegations, without regard to the truth of the denials as to anything which may be prejudicial to the minor.

2. CONVEYANCES: *Repugnant provisions.*

A tenant by the curtesy conveyed his life-estate to his children, the remaindermen, reserving to himself the right to use, manage and control the property during his life for the education, maintenance and support of the grantees, notwithstanding their future marriage or majority. In a contention that the reservation was repugnant to the deed and void: *Held, aliter:* that the reservation was not of title or estate, but one of power: that the deed was the same, in effect, as if the father having the legal title, had covenanted to stand seized of it for the sole use of his children, and had reserved the power to exercise an active trust in their behalf for all the purposes expressed in it.

CROSS-APPEALS from *Lincoln* Circuit Court in Chancery.

Hon. JOHN A. WILLIAMS, Circuit Judge.

*McCain & Crawford* for appellants.

The court erred in divesting Wm. F. of his possession and control of the land, and in decreeing partition.

The instrument was good as a covenant to stand seized for the use and benefit of the children. The old rule that where the provisions of a deed are repugnant to, or inconsistent with each other, the first will prevail, and that conveyances will be construed most strongly against the grantor, has been much restricted in modern times. Equity takes the whole *instrument,* and construes it as a whole,

and gives effect to the *intention* of the parties, if not against public policy. The meaning and intent of the entire instrument is to create an estate trust by way of covenant to stand seized, by which the grantor should occupy toward the grantees a position perfectly analogous to that of a guardian toward his wards, with only this difference: that so long as the grantor lived the relation as to this property should remain unaffected by the marriage or majority of the grantees. See *6 Ark., 109, 119; 3 Ib., 56; 36 Me., 315; 38 N. H., 212; 3 Atkyns, 493, note; 2 Blackstone by Sharswood, 293; 2 Bos. & Peel, 26; Browning v. Wright, 8 Mass.; Story on Cont., note to sec. 659; 3 Story Rep., 162; 16 Johnson, 178; 3 Rand., Va., 487; 28 Vt., 10; 20 Johns., 84; 2 Saunders, 96; 2 Washburn R. P., ed. of 1868, 392, et seq.; Perry on Trusts, sec. 305; Parsons on Cont., vol. 2, p. 506; note to 507, etc.; 1 Kernan (N. Y.), 315; 12 Ill., 38, 56.*

If a guardian's account is improperly kept, the remedy is not to discharge him and turn the property over to the wards, but to force him to make a proper account. So in case of a trustee, and he may be discharged for fraud or other good cause, and a new one appointed. The words "Varner place," did not include the lands south of the railroad. They were known by other names and as separate places.

Where the plaintiffs are not in possession, there can be no partition. *27 Ark., 77; 40 Ark., 155.*

A remainderman can never have partition. *1 Wash. R. P., 3d ed., 584.*

A party cannot claim under a deed its benefits and repudiate its burdens. *Bisp. Eq., sec. 295; 30 Ark., 458, etc.*

*J. M. Cunningham* for appellees, Rice and wife.

*Adverse* possession bars partition—(*27 Ark., 77; 31 Ark.,*

*345; 40 Ark., 155; Freeman Co-Ten. and Part., par. 447*)—but in this case Wm. F. held as guardian and administrator, which is not *adverse. 28 Vt., 660; Freeman Co-T. & Part., par. 471, 41 N. H., 502; 2 Mass., 479.*

The first clause of the deed is an *absolute* grant, and carries *all* the estate of the grantor, and unless qualified by some *condition consistent* with the grant, the grantees are tenants in fee simple. (*1 Lomax Digest, Real P., 13, 12.*) This is an attempt to convey the land and withhold the use, management and control and dominion over it. This is impossible. The clauses are in restraint of alienation, against public policy, are repugnant to and inconsistent with each other and void, and the entire estate passed free from any restrictions or conditions. *1 Lomax Dig., 264; Coke Lett., 223 A.; 3 Vesey, 324; 4 Sim., 141; Jac., 415; 2 M. & K., 174; 5 Sim., 232; 10 B. & Cres., 433; 18 Ves., 429; 6 N.Y., 467; 4 Gray, 388; 18 Pick., 455; 21 Pick., 42; 11 Penn. St., 37; 19 Ib, 96; 20 Am. Law Reg., 180; 29 Mich., 78.*

Even if held to be a covenant to stand seized, etc., it would be immediately executed by the statute of uses. *27 Hen., 8 c. 10; 2 Lomax Digest, 136.*

It cannot be sustained us a trust. *2 Wash. R. P., 426; Perry on Trusts, 304, 298; 1 Sugd. on Vend., 309, 314.*

As to the meaning of the word "plantation" see *10 Iredell L., 431; Abbott's Law Dict., in verb; 2 Lomax Digest, 211.* It has a legal signification and needs no explanation. It is not the province of testimony to explain the words of a written instrument; it is a question of construction for the court. *9 Wheat, 565; 3 Pick., 348; 4 B. & Ad., 771; 1 Greenl. Ev., 277–8.*

Mrs. Rice not estopped by taking the deed to deny John A.'s title. *16 Pick., 457.*

It was error to give John A. a lien for expenses of

building gin house, etc. A guardian by his contract cannot bind the estate of his wards, nor improve them out of their estate. *5 Mass., 300; 1 Pick., 314.*

EAKIN, J. William F. Varner was tenant by curtesy of a large body of real estate near and partly composing the town of Varner, at Varner's Station, on the Little Rock, Mississippi River & Texas Railway. The fee simple, in remainder, was in his two children, Medora and William I. Varner, of whom he was guardian. Previous to the year 1877, acting under an order of the probate court, which was supposed to be valid, and acting for himself as well as in the character of guardian, he sold off, at private sale, to John A. Varner, two small tracts of the land at Varner's Station, which had been, or were to be, divided into lots. These sales were never reported to, nor confirmed by the probate court. It does not appear that he made any settlement as guardian, or that any property of his wards had come under his control, save their remainder interests in the lands of the mother, and the purchase money for the lands he had sold. It may be remarked in passing that these sales, having never been perfected by report and confirmation, divested no title or interests of his children, and it is unnecessary, therefore, to inquire whether the probate court has jurisdiction, or power to make such orders. They will be considered, with regard to his children, as if never made, except in so far as a question may arise as to the right of the purchaser to *bona fide* improvements.

On the third day of December, 1877, for the expressed consideration of love and affection, he, by deed, released, relinquished, aliened and conveyed to his said children his estate by curtesy in and to the Varner place, at Varner's Station, to hold to them and to their heirs and assigns

forever, subject to certain limitations and conditions; in other respects to be absolute.

These were then set forth as follows: He reserved to himself the right to use and rent or cultivate said plantation for the support and education of his children, and for their maintenance in a style suitable to their condition in life, and to raise such sums as might be necessary to pay taxes and keep the premises in repair; such control to continue, notwithstanding the marriage or maturity of either. He covenanted, nevertheless, that his management of the property should be solely for their benefit, and that as guardian, he would keep a correct account of the proceeds, and of the charges against them, and the plantation; and that such sums as might be due them at his death, should be paid out of his estate. He further reserved the power, if it should become necessary to lay off any portion of the land into town lots, to release his right to persons desirous of building upon or improving the lots, so as to make them more remunerative to the children, such power to be exercised, however, only in cases where the probate court or other court of competent jurisdiction, should refuse to authorize a sale of the fee simple interest in the children:

Finally, it was provided that in case either of the children should marry, or attain majority, such child should have the right at the end of each year to a settlement of the rents and profits for that year. Then follows this closing clause: " The true object of this conveyance being to settle the property aforesaid upon my said children fully and completely, but saving to myself, as their father and natural guardian, the right to control and manage the land for their use and benefit."

The deed was duly signed, acknowledged and filed for record.

The daughter afterwards married, but does not appear to have insisted, at any time, upon the annual account provided for in the deed, or to have recognized any attempted reservation of her father's right to control and manage the property. The marriage seems to have been without her father's consent, and to have produced an estrangement between them. On the thirty-first day of January, 1883, she with her husband, R. R. Rice, began this suit against her father and John A. Varner, who had purchased the parcels of land under the supposed authority of the probate court. Her brother, William I. Varner, still a minor, with interests identical with those of his sister, was made a defendant. As to him proper service was had. He was over the age of fourteen years, and service was made by leaving a copy at his usual place of residence, with a member of his family over the age of fifteen years. This is one of the prescribed modes of actual service, as distinct from constructive, and there is nothing in the statute to distinguish adults from infants as the subjects of such service.

The bill sets forth the lands composing the Varner plantation, embracing over 900 acres; admits that her father had been tenant by curtesy, and exhibits the deed to his children above described. It states that now a partition of the whole place between herself and her brother would be desirable, they being sole owners, but that the lands are in possession of her father Wm. F., and have been since her mother's death, without any account; and that he refuses to make any, or to allow her any share of the rents and profits. Alleging further, that he will continue to hold the land and take the profits, unless prevented, and that he is insolvent.

In a second paragraph, with regard to John A. Varner, the bill alleges that in 1880 he took possession of said

16

lands under a lease from Wm. F., for three years, agree-ing to pay for said lease the gross sum of $7,000 on its de-termination; but that he had never paid anything upon it, or, if anything, very little.

In a third paragraph she charges that after the death of her mother, her father had been appointed guardian of herself and her brother, and had procured an order of the probate court, purporting to authorize him as such to sell off any portion of the land in town lots at private sale. Under this order he had, on the nineteenth day of June, 1876, attempted, by deed, to convey to John A. Varner about six acres of the land, described by metes and bounds, at Varner's Station. The consideration of the sale is charged to have been $5,000. Various reasons are assigned why the sale should be considered void, which it is unnec-essary to discuss, as it was never consummated by the court. It is alleged that he made no account of the money received. She charges that John A. is in posses-sion under said deed, and has been since its execution, as-serting no other title, and that the yearly value of the land is $1,000. She claims half the rents, and that the deed is a cloud upon her title.

A fourth paragraph makes similar allegations of another sale of another portion of about five acres, sold to John A. Varner, under the same authority, for $250, on the twenty-sixth day of September, 1876. This paragraph stands in like attitude with the third.

Besides general relief, there were several specific reliefs in the prayer:

First—For partition.

Second—For a receiver of the property still in the hands of Wm. F. Varner.

Third—For an account with John A. Varner for the years 1880, 1881 and 1882, during which he held the

lease, and a decree against him for the amount found due.

Fourth—That the order of the probate court for the sale of the lands be held null, the deeds be canceled, and an account taken of the rents and profits.

Wm. F. Varner in his answer denied that the designation "Varner place" in his deed meant to include all the lands set forth in the complaint, but says it was then usually applied to that portion of the lands lying north of the railroad. He denies the right to partition of the lands, or to their possession by complainant. He says he has spent all the profits of the lands in educating, supporting and maintaining his children. He denies that she has a right to call for any account of rents and profits, saying that by the deed set up he never meant to surrender his right by curtesy. The explanation of the deed he makes is this: That he was then very much in debt, and was threatened with suits by creditors, and that he made the conveyance with intent to delay them, and obtain more favorable terms for a settlement, by placing his property beyond their reach.

He says that since the death of his wife he has made extensive and valuable improvements on the lands worth $5,000, besides expending annually large sums for his children, about $500 each, which is largely in excess of what he received.

He says further, that the lease to John A. Varner was for three years for $2,000 per annum, which has been paid and properly expended in the maintenance of his children. That the parcels of land sold to John A. lie south of the railroad, and are not part of the Varner place, and that the sales were made in good faith. That he had a life estate in those lands, and has expended for his children more of the purchase money received than would

properly have fallen to their share. With this answer a demurrer was filed.

John A. Varner, in his answer, sustains Wm. F. as to the terms of the three years' lease, and the payment of the rent. As to the parcels purchased and held by him, he contends that the sales were valid and made in good faith, and that he had spent about $5,000 in improving. He denies also that the lands south of the railroad were included in Wm. F. Varner's deed to his children, not being considered part of the "Varner place." It is understood that these parcels lie to the south. He makes his answer a cross-bill for improvements, and also demurs.

1. PLEAD-ING: Answer of guardian ad litem. The answer of the guardian *ad litem* denies generally such of the allegations as it may be important to controvert, and submits the rights of the minor Wm. I. Varner to the court. This pleading is not to be approved. It amounts to no answer at all, and is useless. If all that may be required is to simply file such a paper in a perfunctory way, the statute might just as well have declared the issue to be made in all cases by the allegations of the complaint, without any answer by a guardian, as allegations of new matter in an answer are put in issue without reply. It is the duty of a guardian *ad litem* to make a full defense without regard to the truth of the denials as to anything which may be prejudicial to the minor. That is illustrated in this case. One of the allegations is that a partition was desirable and might be fairly and justly made. It may not be true that it could be, at this time. It might be detrimental to the interest of the minor. The court made no inquiry as to that because no adverse pleading seemed to require it, and no proof on the subject was taken before partition was decreed. It is better that the answer of a guardian should specifically deny material allegations. It need not be verified by oath.

There was evidence to show that the plantation known as the Varner place included only those lands at Varner's which had belonged to Mrs. Wm. F. Varner, lying north of the railroad. Also that the father had paid out large sums of money annually in the support of his daughter, Medora, up to the year 1882, when she married. About fifty acres of additional lands have been brought into cultivation upon the plantation since 1876. Cabins and an expensive gin house have been erected, and other expenses incurred in the management of the place.

The first decree was rendered at the February term 1883, the case having been heard upon the pleadings, exhibits and depositions. The Chancellor held that the attempted conveyance of the two small tracts to John A. Varner under the supposed authority of the probate court, were void and of no effect upon the interests of the minors, but did convey the life interest of William F. In so far the title of John A. was confirmed, and in other respects the said deeds were canceled.

As to the rest of the lands it was ordered that partition be made equally between the said Medora and her brother William I. Varner, and commissioners were appointed for the purpose. It was ordered, however, that it was to be made without predjudice to the right of William F. Varner to keep in possession and control the portion assigned to William I. Varner, and without prejudice to the right of the latter to contest the right of his father to do so. To avoid the loss of a crop a receiver was appointed to take possession of the property and rent it for the current year.

The engine and gin stand upon the place were declared to be personal property, and leave was given to any other parties to the suit to contest John A. Varner's right to

the same, at the next term of court. Meanwhile those articles to remain in the hands of the receiver.

From this decree both parties, save William I. Varner, one of the defendants, appealed. The transcript of the case to this stage of the proceedings was brought up and filed. It claims our attention first amongst the consolidated cases.

The complainants contend, with regard to the eleven acres sold to John A. Varner, that William F. professed to act only as guardian, and to sell only the interests of his wards, under the supposed authority of the probate court. That nothing at all passed by the deeds, and that the curtesy of Wm. F., with regard to these portions, remained in him, until the deed of 1877, when it passed, with all the rest of the Varner place, to Medora and her brother.

What is meant by "the plantation called the Varner place" is matter which does not explain itself, and must be shown by evidence *aliunde*. When shown, it is that which the deed of 1877 carries to the children. The evidence on this point tends to show that at the time the deed of 1877 was executed, the lands north of the railroad were considered to make up the Varner place. Those parcels of land conveyed to John A. Varner lie to the south of the tract, and in this view they would not be included in the deed of 1877, whatever may be its effect. It appears, however, that before the lands were cut by the railroad, they lay in a solid body, and may be considered as all having then belonged to the Varner place; that, indeed, does not preclude the idea that under the changed circumstances they were not so spoken of nor regarded. But it is most probable that by Varner place, all the lands were meant.

As between William F. and John A. Varner, the former and those claiming under him afterwards, are estopped to

Varner v. Rice.

deny that his curtesy passed to the latter. The deeds recite that, as guardian, William F. had been empowered to sell and convey, and had so sold; and in conveying, he describes himself as guardian, acting under the power vested in him by the said court. Still he' conveys the whole land, or the whole estate in the land, without qualification to indicate that he meant only to convey the remainder interest of the heirs. The lands were sold at a full price for the whole estate, and it seems that immediate possession was given. Besides, the order of the probate court, introduced by complainants as an exhibit to their bill, recites that said William·F. had petitioned to sell the whole land *for himself, in his own right and as guardian*, and had set forth his estate by curtesy and the fee of the heirs subject to it, and alleged that it would promote the interests of the heirs to have the special lands sold to purchasers for improvement. The order itself was to the effect that the sale might be made for himself and as guardian, and that he might retain all the funds arising from the sale for his natural life. This is the order referred to in the deed, and it was obviously made with the understood condition that he must sell his own interest as well as that of his children. Otherwise, the object in authorizing the sale of the remainder interest would not be accomplished. It was to enhance the value of their remainder interest in other surrounding property, by the improvements expected to be put by purchasers upon that which was to be sold. The curtesy passed to John A. Varner by the deed, although, for want of confirmation, it had no effect upon the estate of the heirs, and the Chancellor did not err upon that point.

With regard to the other lands of the plantation, the whole equity of the bill turns upon the construction of the deed to the children, made by William F. Varner, in

2. CONVEYANCES: Repugnant provisions.

1877. The court held that it vested in them an absolute fee-simple, enjoyable *in presenti*, without restriction or qualification, and subject to immediate partition. This view is based upon the direct terms of the conveyance in the first clause, and the declarations of the grantor that he intended it to be absolute, without regard to the limitations and conditions of the gift by which he endeavored to retain in himself not any beneficial enjoyment of the property, but the management and control of it for their benefit during his life, with a power to sell his life estate in portions of it to others, for the purpose of having it improved and made more remunerative to his children in the future; this latter power to be exercised only in case of his failure to obtain the authority of some proper court to sell the whole estate. It was contended, and the Chancellor so ruled, that such conditions could not consist with the grant, and must be disregarded.

It is obvious, upon a very short reflection, that the view taken by the Chancellor is a technical one, based upon an old common law rule of construction, that, where clauses of a deed are inconsistent, the first must prevail, and that no estates of a novel nature can be created with restrictions upon their enjoyment and use, or in modes of devolution not appertaining ordinarily to other estates.

The deed, in *substance* and *effect*, violates no rule of public policy. It would be everywhere conceded that a man may do what he will with his own, if it violates no public policy and interferes with no previously vested rights of others. No one will doubt that the father might have conveyed this life estate to another, and invested him with an active trust to manage and control it for the benefit of his children, and to sell the life estate in such lots to be carved out of it as he might select, in order that improvements put upon them might enhance the value of the re-

mainder interests already owned by the children. This would be to some extent in restraint of alienation, but such restraints are permissible during a life or lives in being, and twenty-one years and a few months afterwards. If he might convey the lands to a third person in such trust, there is no principle in the way of his retaining the legal title and declaring such a trust in himself. It would be a valid gift in equity, according to its terms, which a Chancellor might take cognizance of and enforce by appropriate proceedings.

It were much to be regretted, indeed, if such a disposition of a curtesy could not be made by a father desirous of no private benefit to himself, and willing that the children of the mother should enter into the enjoyment of her property, without risking on his part a concealed hope in their hearts of his own speedy death. At the same time a very slight experience of the world would satisfy him that both life estate and fee might be soon squandered if it were put in their power to allienate both together on coming of age. By such means as are above indicated he might whilst he lived be enabled to some extent to guard them against improvidence and protect them from want, whilst enjoying the fruits of their mother's property. Misfortune might wrest it from him, if retained in his own hands. It may be noticed here that the father openly avows in his answer that he attempted to put the property out of the reach of his creditors. That of course he could not do with regard to existing debts, or perhaps those he then had it in view to contract, and when such creditors come into chancery, they will be heard upon their own equities. Meanwhile the conveyance now in judgment is to be construed without any reference to fraud upon creditors. There certainly would be no fraud if such conveyances in trust as I have supposed were made

Varner v. Rice.

with a view to the general chances of life, and in fraud of
no existing creditors.

The reser-
vation is of
power, not
of estate. To reach the case here presented, we must go a step
further. Here is no conveyance of a legal title clothed
with a trust in the grantee; no declaration of a trust upon
a dry legal title reserved. The reservation is not of title
or estate, but only one of power, and the real question
resolves itself in this: Can a grantor, reserving no title
in himself, nor beneficial interest, be clothed with the au-
thority, during his whole life, to manage and control the
property of the grantee, who has both legal title and full
beneficial interest, and is competent to act *sui juris*. This
is the power which the grantor in this case attempted to
reserve. The question is more difficult than practically
important. I have not found any precedent precisely in
point, and few like instances are apt to occur.

It is certainly a well settled rule of law that where
property is conveyed with conditions as to its devolution,
use or enjoyment which are repugnant to the nature of the
estate or interest granted, the grant prevails untrammelled
by the conditions. It becomes absolute. Public policy, too,
certainly requires that all property in the hands of its
owners should be governed by uniform laws, as to the
powers of the owners over it. *Stukely v. Butler, 1 Hobart,
168; Bradly v. Peixoto, 3 Vesey Jr., *324; Greenleaf's Cruise,
vol. 1, tit. 18, chap. 1, sec. 2, p. 466, 2d ed., and note.*

It is true, moreover, that powers in trust over the prop-
erty of another to be exercised without the support of the
legal title, although recognized and upheld in equity, are
generally not of the nature of continuing active trusts, but
in most of the cases of which we have precedents, are
mere powers of appointment or of disposition. Still there
is nothing in the policy of the law that precludes the crea-
tion of powers in trust to be exercised in the administration

and management of property for the benefit of the own-
ers, especially where the owners derive all their rights
from the will and bounty of those to whom the powers
may be intrusted.   After all it is but the exercise of a
power which is committed to every trustee of an active
trust, and it can make no substantial, but merely a techni-
cal difference, that such power may or may not be attend-
ed with a formal conveyance or reservation of the legal
title.   This deed is precisely in effect as if the father,
having the legal title, had agreed to hold the same, to
stand seized, as it is termed, for the sole use of his chil-
dren, and had reserved the power to exercise an active
trust in their behalf for all the purposes therein expressed.
His meaning and intention would have been as accurately
expressed in that way as by the terms he used.

Conditions repugnant to a grant are void, but condi-
tions may be necessary to show what is granted and was
intended to be granted.   The conditions of this deed show
plainly that the donor did not grant nor intend to grant
the property with absolute control.   The question really
is not whether the conditions are repugnant to the grant,
but whether the grant itself, with the conditions annexed,
violate any rule of property, or create any kind of property
or estate unknown to the law.   The estate and interest
purporting to be given are familiar to courts of equity,
and also in cases of persons not *sui juris*, familiar in courts
of law.   It is the usual case of *cestuis que trustent* of an
active trust, and of all classes of wards.

We do not think where the meaning is plain any court
of equity can insist upon any set form of words.   Courts
of equity never did, and courts of law are fast ceasing to
do so.

It is a maxim in equity that it looks to the intent and
not to the form.   It always looks at the substance of

things, and attempts to reach that, and to enforce the rights and duties which spring from that, and the real intent of the parties. As well said by Mr. Pomeroy: "It will never suffer the mere appearance and external form to conceal the true purposes, objects and consequences of a transaction. The principle of looking after the intent and giving it effect was fully recognized and distinctly formulated at an early day."

The rule that the exception of a thing granted is repugnant to the grant has no application to this case. An exception is something excluded from the operation of a granting clause, something outside of the thing granted —something which never passes at all. Here there is no exception, but an attempted reservation out of the thing granted—a power attached to it and growing out of it.

The case of *Colby v. Colby*, *28 Vt.*, *10*, is stronger than this. A father executed to his son a warranty deed for one hundred acres of land, in the usual form, with this condition: "Provided, nevertheless, and it is the expressed condition of the deed, that I am to have the use and improvement of the premises during my life, if I have occasion therefor and shall choose to do so." This deed was sustained. The court, by Mr. Chief Justice Redfield, said that the only sensible construction that could be put upon the deed was that it gave the fee to the son with a life estate in the father. Yet in terms it conveys the whole estate and not a remainder, and the reservation is quite as repugnant to the enjoyment of the property by the son for the father's lifetime as this. It is more so, for in this case the father reserves nothing for his own benefit. The true meaning of this is simply that the father agrees to give the children the substantial enjoyment of the property during his estate by curtesy, by managing and using it for their benefit. In so far it is the gift of a use and irre

-vocable, but it seems to us too technical for modern times, and the present stage of judicial progress, to say that because he attempted to do that by the form of a grant with a reservation of power, he shall forfeit all control of the property, and place himself in an attitude never intended.

*Jackson v. Swart*, cited by counsel for appellant, is of like nature and quite as much in point. *20 Johnson, p. 84.*

In New York, where express trusts are regulated by statute, all express trusts not valid under the statute are sustained as powers in trust. *Pom. Eq. Jur., sec. 1002, note.*

We need not multiply authorities to show that courts of equity will give effect to the plain intention of all instruments, regardless of form, where it may be done without violation of any rule of public policy. It would be a reproach to the whole system if it did not. The age of technicality has passed away even at law, or is fast passing. They have ever been mere cobwebs with the enlightened Chancellors of England.

This deed is to be construed and held as if it were a covenant to stand seized of the title of the curtesy to the uses of the children in active trust, and as not entitling them to the actual possession and management of the property during the time he may be allowed by the courts to exercise it. Of course, like all trustees, he will be held by courts of equity to strict fidelity to the self-imposed trust, or by the probate court to a settlement of the proceeds of the property whilst his guardianship lasted. No effort has been made to do that as yet in the court which has exclusive original jurisdiction. There are appropriate means of coercing that against him and his sureties as guardian. He may be called to account by the court of chancery for his administration after the maturity of the children. He is liable to all the duties, and subject to all

*Construction of the deed.*

the supervision which other trustees are, and for flagrant abuse of the trust may be removed. The rights of the children are in all respects against him, as they would be against a stranger trustee who had never owned the property.

The court erred in holding that they were entitled to the possession, and in decreeing partition, and in all the subsequent proceedings to carry the partition into effect.

### SECOND APPEAL.

After the first decree and the appointment of a receiver, John A. Varner filed a supplemental bill, showing a contract made with William F. Varner for building the gin on the Varner place, in which Wm. F. acted as administrator of his wife and guardian of his children. It expresses that in consideration that said John A. had expended money in purchasing a steam engine and gin-stand, and in the erection of a gin-house, the said Wm. F. agreed to furnish him with enough land to build the house upon and use it conveniently free from rent and costs, and that he, said John A., should have the full control and use of the same, and one-fifth of the net profits arising therefrom, the remaining four-fifths to be placed to the credit of the gin-house account, with power in said John A. at any time to remove any of said property without any claim to the same to be made by said Wm. F. Upon his part John A. agreed to give a bill of sale of the property and release all claims, upon payment of the full cost of the engine, gin-stand and house, with ten per cent.

He claims that the machinery and house are personal property, which cost him about $3,500, and that he has not been paid for the same, after allowing all just credits according to the contract—there being still due him about

$2,400. All of it was taken into the hands of the receiver, who has rented it out with the plantation for 1883, and had refused to recognize John A.'s rights. He alleges the proportional value of the gin, etc., to be $187.50 for the year, and now prays that said amount be paid him by the receiver, that his right to the property be declared, and that he be put in possession, with the right to retain it until the gin account be satisfied out of the rents and profits, or that he be allowed to remove it, or that it, with sufficient ground, be condemned and sold for the debt.

This was answered by Rice and by the receiver, and the application was heard upon the accounts and evidence. The Chancellor found that the building of the gin-house was beneficial to the property of the owners, and decreed that John A. was entitled to the rents and profits till his debt should be paid off, although the house and machinery should remain on the place as a part of the realty. The receiver was ordered to pay the sum of $187.50 to go as a credit on the debt, that being the proportion of the rent for 1883 accruing on account of the gin, and so on for succeeding years till the debt be paid. The gin account was referred, with directions, to a Master for restatement. It was provided, however, that the two owners, Medora and William I., within thirty days after the latter coming of age, might require John A. to remove the house and machinery. From this decree the plaintiffs appealed and file a continuation of the transcript after the first decree.

This decree was in response to the cross-relief prayed by John A. Varner. It has no connection with the partition proceedings, and so far as it gives him the right to be paid out of the proceeds of the property, seems just. So much of it as contemplates the continuance of a receiver and the right of the children to require him to remove the house and machinery, is inconsistent with this

opinion and erroneous. He had the right to have his claim against the property ascertained, under his contract with William F. Varner, and to the directions of the court to have it paid out of the rents and profits, which payment would inure as a credit to William F. in the administration of the property.

## THIRD APPEAL.

The report of the commissioners to make partition was afterwards filed. They had allotted to William I. Varner the portion of the plantation upon which the gin-house and machinery was located. They had considered the gin-house as realty, and had estimated its value in the partition, not including the machinery, engine and boiler, etc., which they considered as personalty, and did not estimate. William I., by his guardian ad litem, excepted to this report because the gin-house was subject to a lien in favor of John A. Varner for an amount greater than its value, and that this lien was not considered in estimating the values of the separate parts. One of the commissioners testified that in estimating values they had made no allowance for the lien, but says that he is satisfied that the portions of land are of equal value, independent of the gin-house, and that William I. has the advantage to the extent of it. The court overruled the exception, confirmed the report and decreed the partition accordingly. The receiver was also ordered, after paying all the costs and expenses of litigation, to pay balance in his hands to the two heirs equally. From this decree William I. Varner appeals.

The receiver made a report which, without exceptions, was confirmed, showing a disposition of all funds on hand. The Master also, appointed to restate the gin account, made his report, showing the sum due John A. Varner. This, too, was approved without exceptions, and thereupon

the court decreed said sum to be a lien on the gin-house and machinery, to bear interest at ten per cent., and that the receiver should continue to rent the same from year to year, and pay the profits to John A. Varner till the debt should be extinguished, less the sum of $187.50 already paid. From this order, William F., John A. and William I. Varner all appealed.

So much of this decree as approves the report of the commissioners and confirms the partition, is erroneous and falls within the decision. There is no objection to so much of it as fixes definitely the lien of John A. on account of the gin and machinery. That seems proper, as well as the confirmation of the accounts of the receiver.

DIRECTIONS FOR A DECREE.

Order that so much of the decree as confirms and establishes the title of Medora Rice and William I. Varner to the remainder interest, after the death of the father, in the lands purchased by John A. Varner, be affirmed, as also so much as fixes the lien of the said John A. upon the gin-house and machinery for his money expended in that regard; and also the order confirming the report of the receiver up to the time it was made.

Reverse so much of the decree as holds the said Medora Rice and William I. Varner entitled to the immediate possession of the Varner place, and the decree for partition, and all subsequent proceedings to carry the partition into effect. Remand the cause, with directions to discharge the receiver after passing his accounts, and restore the possession and control of the premises to William F. Varner, with leave to apply again for a receiver, if it should be found necessary to secure what may be due to the beneficiaries on an account of the rents and profits since they

17

respectively became of age, and with leave to all parties to amend their pleadings, or file such supplementary pleadings as may be necessary to a full settlement of all matters of account, upon the basis of the rights herein declared, and for all further proceedings consistent with law and this opinion.